**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Hayley A. Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

DANIEL PEMBERTON, an individual, on behalf of himself, the general public, and those similarly situated,

Plaintiff,

v.

RESTAURANT BRANDS INTERNATIONAL, INC. AND RESTAURANT BRANDS INTERNATIONAL US SERVICES LLC,

Defendants.

Case No. 3:25-cv-03647-JCS

**PLAINTIFF'S OPPOSITION MOTION TO COMPEL ARBITRATION, AND IN THE ALTERNATIVE, FOR LIMITED DISCOVERY PRIOR TO RESOLVING THE MOTION TO COMPEL**

Hon. Jacqueline Scott Corley

DATE: September 4, 2025
TIME: 10:00 a.m.
CTRM: Courtroom 8, 19th Floor

**TABLE OF CONTENTS**


I. INTRODUCTION ....1

II. BACKGROUND ....2

A. Plaintiff's Claims and Visit to the Website....2

B. The Underlying Arbitration ....4

C. RBI's Conspiracy Theories....5

III. ARGUMENT....7

A. Plaintiff is Not Subject to the TOS ....7

B. Defendants' Waiver and Estoppel Arguments Are Without Merit....9

C. RBI's Requested Discovery Is Overbroad and Unnecessary....14

IV. CONCLUSION....15

# TABLE OF AUTHORITIES

## CASES


*Acevedo v. Russell Cellular Inc.*, 2021 U.S. Dist. LEXIS 49300 (E.D. Cal. Mar. 16, 2021) .......... 7

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) .......... 7, 8, 9

*Blau v. AT & T Mobility*, 2012 U.S. Dist. LEXIS 217 (N.D. Cal. Jan. 3, 2012) .......... 14

*First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938 (1995) .......... 7

*Fischer v. Saberhagen Holdings, Inc.*, No. C09-5385RJB, 2009 U.S. Dist. LEXIS 108128 (W.D. Wash. Nov. 19, 2009) .......... 6

*Garcia v. Amazon*, No. 2:21-cv-00604-SBMRW, 2021 U.S. Dist. LEXIS 134403 (C.D. Cal. May 25, 2021) .......... 12

*Gorlach v. Sports Club Co.*, 209 Cal. App. 4th 1497 (2012) .......... 13

*Heavenseven GMBH v. Lovetuner, Inc.*, No. 2:22-cv-03464-MEMF(SKx), 2022 U.S. Dist. LEXIS 151555 (C.D. Cal. Aug. 17, 2022) .......... 10, 11

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019) .......... 10

*In re Holl*, 925 F.3d 1076, 1083 (9th Cir. 2019) .......... 7

*Ingle v. City Circuit Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003) .......... 7

*JPV I L.P. v. Koetting*, 304 Cal. Rptr. 3d 550 (Cal. Ct. App. 2023) .......... 9

*Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125 (C.D. Cal. 2006) .......... 7

*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) .......... 11, 12

*Nghiem v. NEC Elec.*, 25 F.3d 1437 (9th Cir. 1994) .......... 12

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) .......... 7, 8, 9

*Openshaw v. FedEx Ground Package Sys.*, 731 F. Supp. 2d 987 (C.D. Cal. 2010) .......... 12

*Pen. Plan for Pen. Tr. Fund for Op. Eng'rs v. Weldway Const., Inc.*, 920 F. Supp. 2d 1034 (N.D. Cal. 2013) .......... 11

*PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692 (6th Cir. 2019) .......... 12

*Ramirez v. Trusper, Inc.*, No. 5:24-cv-02012-EJD, 2024 U.S. Dist. LEXIS 117910 (N.D. Cal. July 3, 2024) ..... 14

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010) ..... 10

*Roderick v. Mazzetti & Assocs., Inc.*, 2004 WL 2554453 (N.D. Cal. Nov. 9, 2004) ..... 12

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ..... 13

*Stewart v. Blue Cross/Blue Shield of NV*, 81 Fed. Appx. 904 (9th Cir. 2003) ..... 12

*Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781 (9th Cir. 2001) ..... 11

*United States v. Olano*, 507 U.S. 725 (1993) ..... 11

Weeks v. Interactive Life Forms, LLC, 100 Cal. App. 5th 1077 (2024) ..... 7

**STATUTES**

9 U.S.C. § 4 ..... 14

FAA § 4 ..... 14

## I. INTRODUCTION

Defendants Restaurant Brands International Inc. and Restaurant Brands International US Services LLC (collectively "RBI" or "Defendants") do not even attempt to carry their burden to show that Plaintiff—merely by browsing Defendants' Website—agreed to the arbitration provisions in the Terms of Service ("TOS") for Defendants' Website. Indeed, Defendants do not even submit a declaration establishing what the operative terms were or how Plaintiff allegedly agreed to them when he visited the website. Instead, Defendants rely entirely on bogus *ad hominem* attacks and misguided waiver and estoppel arguments.

First, Plaintiff is not bound by the arbitration provision in the Website's TOS because he did not know or have reasonably conspicuous notice that his use of the Website made him subject to arbitration with RBI. Indeed, Plaintiff's understanding was that he and RBI had agreed only that his continued use of the Website would not be tracked (an agreement which RBI immediately violated). As the party seeking to compel arbitration, RBI has the burden to prove the existence of an agreement. That it does not attempt to do so in its motion is telling. Indeed, RBI all but admits that, if the facts exist as Plaintiff alleges and attested to in his sworn declaration, Plaintiff did not agree to arbitrate his claims. The case law is replete with examples of unenforceable browsewrap agreements, like the one at issue here, which calls into question whether RBI ever had a good-faith basis to assert that Plaintiff's claims were subject to arbitration.

Next, as an arbitrator previously found, Plaintiff has not waived his right to challenge the arbitrability of his claims. Having fully and voluntarily litigated that issue in the arbitration, Defendants are precluded from relitigating that decision and have themselves waived their right to argue that the arbitrator lacked authority to decide the issue. Even if this Court were to consider Defendants' waiver argument anew, there is no basis to find waiver because Plaintiff consistently maintained every step of the way—in pre-dispute correspondence, in his arbitration demand, and throughout the arbitration—that he had *not* agreed to Defendants' TOS; that he wanted a threshold ruling on that dispute; and that his claims were not subject to mandatory arbitration on the merits.

Finally, RBI complains that it needs additional discovery determine whether Plaintiff's claims are subject to arbitration. But it supports this request by twisting the record to make commonplace events in a litigation—such as delayed discovery of a hidden harm and two plaintiffs in a putative class action having similar claims—appear "suspicious." The Court should decline RBI's invitation to allow a fishing expedition supported only by conspiracy theories and inuendo.

Finally, the irony that Defendants complain about "weaponiz[ing]" the arbitration process when it is their preferred forum of dispute resolution should not be lost on this Court. Apparently, it is fundamentally unfair for consumers to seek an arbitral determination of certain threshold issues, but completely fair for Defendants to use the same process to litigate the merits of Plaintiff's claim. Regardless, and despite RBI's mischaracterization of the record and its baseless *ad hominem* attacks on Plaintiff and counsel, there is no basis here to compel Plaintiff to arbitrate his claims.

Accordingly, the Court should deny RBI's motion.

## II. BACKGROUND

### A. Plaintiff's Claims and Visit to the Website

The underlying claims in this dispute involve an egregious violation of privacy and social norms. Plaintiff alleges that Defendants operate a website for its affiliate, Burger King Company LLC, located at www.bk.com (the "Website"). The Website, allows visitors to, among other things, search for and view content related to Burger King restaurants, including their locations and menus.

In or around March 2023, Plaintiff visited the Website to browse information about Burger King products and locations. Class Action Complaint, ECF No. 1 ("CAC") ¶ 84. When Plaintiff visited the Website, the Website immediately presented him with Defendants' popup cookie consent banner, which provided the option to accept cookies or choose the manage "Cookie Settings" button.




Plaintiff viewed Defendants' representation on the above popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising, and analytics partners." CAC ¶ 85. Consistent with his typical practice, Plaintiff clicked the manage "Cookie Settings" button. The Website then displayed to Plaintiff the cookie consent preferences window.



Plaintiff moved the toggle to the left to opt out of the sale/sharing of his personal information and opt out of all cookies, except those that were strictly necessary, including targeting cookies and performance cookies, and clicked the "Confirm My Choices" button. CAC ¶ 86.

Defendants' representations that Website users could opt out of the sale/sharing of there. personal information and opt out of all cookies were untrue. CAC ¶ 88–90. As relevant here, however, at no point in this process did RBI display the Website's TOS to Plaintiff. Indeed, other than electing or managing cookies preferences, there is no other click option. There is also no click or check-box agreement to the TOS in the Cookie Banner or Cookie Settings window. Indeed, neither even mention the TOS. The Website also does not have a link to the "Terms of Service" on the home page (or any other substantive webpages). Rather, a user must first click on the small "menu" icon that is displayed as three parallel horizontal lines (displayed as "≡"). Then the user is shown a list of hyperlinks and choose the link to the Terms of Service, which appears among a list of many other hyperlinks.

**B. The Underlying Arbitration**

The Website's TOS purport to bind those who visit the Website to arbitrate "all" disputes with the American Arbitration Association ("AAA"). Safier Decl. Ex. A. Plaintiff, however, is not bound by the arbitration agreement because he did not have actual notice, nor were the TOS sufficiently conspicuous to put Plaintiff on notice of the terms.

In November 2023, Plaintiff's counsel notified Defendants that Plaintiff alleged that they knowingly (and without consent) cause third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear rejection or declination of such third-party cookies. CAC ¶ 93.

In response, Defendants asserted that Plaintiff's claims were subject to arbitration by virtue of the Website's "Terms of Service," which includes an arbitration agreement and class action waiver. Plaintiff's counsel explained that Plaintiff did not take any action to manifest his assent to the Terms of Service (such as checking a box or clicking a link) and therefore the

arbitration provision was inapplicable to Plaintiff's claims. Defendants disagreed and claimed that Plaintiff's dispute was subject to the Terms of Service. CAC ¶ 94.

On or about November 13, 2023, Plaintiff timely filed an arbitration demand against Defendants with the American Arbitration Association ("AAA"), Case No. 01- 23-0005-1398 in which he provided Defendants with *notice* of the claims asserted in this Complaint and his intent to ultimately pursue those claims on behalf of other similarly situated class members, but which Plaintiff did not seek to litigate in the arbitration. CAC ¶¶ 95–96. At all times, Plaintiff objected to RBI's position that the Arbitrator had jurisdiction to decide the merits of his claims. Rather, in commencing the arbitration and at every step of the process, Plaintiff elected to present only the threshold issue of arbitrability to the Arbitrator. RBI was at all times aware of Plaintiff's position. *See* CAC ¶ 96.

On July 9, 2024, the Arbitrator issued a decision in which he held that Plaintiff had not waived his objection to jurisdiction, but found that he could not rule on the threshold arbitrability issue. *See* CAC ¶ 97. As Plaintiff cannot obtain a decision on arbitrability before the Arbitrator—and is not subject to the TOS—he has now filed his claims before this Court.

**C. RBI's Conspiracy Theories**

In addition to the facts above, RBI levels myriad, false accusations at Plaintiff and Plaintiff's counsel concerning the propriety of Plaintiff's claims and his counsels' conduct. Although these "facts" are irrelevant to the motion, the record must be corrected.

First, RBI attempts to make hay about Plaintiff's counsels' former client and the fact that Plaintiff visited the Website around the same time as this client and has similar claims. ECF No. 11 ("Mot.") at 5. To be clear, there is nothing untoward or surprising about the timing of Plaintiff's visit to the Website. Indeed, Plaintiff believes, and seeks to represent, an entire class of persons who visited the Website during the same timeframe—i.e., during the proposed class period. Nor should RBI be surprised that more than one person visited the Website in March of 2023 or even that a former client decided not to pursue their claims.

Second, RBI asserts that it is "[i]nteresting[]" that "Plaintiff claims he did not discover his alleged opt-out was not honored until seven (7) months later, 'on or around October 20, 2023 when he learned of Defendants' privacy violations *from his counsel*.'" Mot. at 4. There is nothing unusual or interesting about this. Plaintiff alleges that he visited the Website in March of 2023 and then, months later, learned of RBI's unlawful conduct. What would be more interesting would be a plaintiff who knew when he visited the Website that RBI was lying to them. RBI's attempt to spin this into something untoward underscores its lack of relevant argument in opposition.

Third, RBI also attempts to make an issue out of a separate matter in which an Arbitrator—wrongly—imposed sanctions where a client of Plaintiff's counsel later discovered that she was subject to an arbitration provision due to a purchase made by a family member using her credit card. *See* Mot. at 2, 6–7; Safier Decl. Ex. B (Ruling on Dispositive Motion and Interim Award, dated January 15, 2025, in arbitration *[Claimant A] v. Dollar Tree Stores, Inc.*, AAA Case No. 01-24-0000-2537). RBI and its counsel were not involved in the case. Instead, they seem to have gathered the information from other filings. If the Court is interested, Plaintiff's counsel will happily discuss who did what, and when, in that arbitration in a separate filing or at the hearing. *See, e.g., Fischer v. Saberhagen Holdings, Inc.*, No. C09-5385RJB, 2009 U.S. Dist. LEXIS 108128, at *3 (W.D. Wash. Nov. 19, 2009) (noting that the briefing on a motion was marked by ad hominem attacks by both counsel on the motives and litigation strategy of the other and reminding the parties that "such attacks are not helpful and briefing should be much less *ad hominem* and limited to *ad lex*, *ad facta*, and *ad facta juridicum*"). Suffice it to say, that a single unjustified loss before the AAA is hardly evidence of bad faith or underhanded conduct. And RBI's attempt to spin this single instance into intimations that it may seek to invoke the "crime-fraud" exception is pure histrionics aimed at distraction.

Finally, although it is clear that RBI takes issue with Plaintiff's strategy of attempting to resolve the arbitrability issue through arbitration—a process that is designed to provide efficient, confidential, resolution of disputes (benefits RBI itself typically values)—that hardly makes Plaintiff's actions improper. Indeed, if Plaintiff and his counsel are guilty of "weaponiz[ing]"

arbitration, then so too are the thousands of companies—including RBI—who attempt to bind consumers with manifestly unenforceable arbitration provisions as a means to discourage consumers from seeking to hold them accountable for various unlawful conduct.

**III. ARGUMENT**

**A. Plaintiff Is Not Subject to the TOS**

Defendants do not even attempt to establish that the TOS is an enforceable agreement because they know it is unenforceable browsewrap.

In determining whether a valid arbitration agreement exists, the Court must apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, Plaintiff asserts that he did not agree to the TOS; accordingly, California law applies. *See In re Holl*, 925 F.3d 1076, 1083 (9th Cir. 2019) (noting that courts apply state law principles of contract formation and interpretation when determining if the parties entered into a binding arbitration agreement); *see also Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125, 1130 (C.D. Cal. 2006) (citing *Ingle v. City Circuit Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003)); *see also Acevedo v. Russell Cellular Inc.*, 2021 U.S. Dist. LEXIS 49300, at *6 (E.D. Cal. Mar. 16, 2021) (whether a valid arbitration agreement exists is a question of contract formation).

Contracts formed over the Internet generally fall into two categories: (1) "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use"; and (2) "'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); *see also Weeks v. Interactive Life Forms, LLC*, 100 Cal. App. 5th 1077, 1085 (2024) (describing same analytical framework). These two categories of Internet contracts fall on two ends of a spectrum; courts routinely find clickwrap agreements enforceable but are generally reluctant to enforce browsewrap agreements. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *Weeks*, 100 Cal. App. 5th at 1085 (holding "clickwrap agreements

have been held to manifest assent, even on consumers who did not read them" and because browsewrap does not require the user to take any unambiguous [] action to agree to the terms of use, "courts have reached consistent conclusions" generally finding "browsewrap agreements to be unenforceable.") At the absolute best, this case presents nothing more than an unenforceable, browsewrap agreement.

The Website here does not include a clickwrap or sign-in wrap agreement. There is no separate or explicit text box or clickable button that says "I agree" to the TOS. No sign-in agreement says that clicking the sign-in button constitutes agreement to the TOS. Indeed, there is no mention or incorporation of the TOS into any agreement—i.e., the Cookie Banner or the Cookie Settings—that a user must click. In fact, other than, at best, an inconspicuous menu link in the upper lefthand corner of the Website, which was itself leads to another inconspicuous Terms of Service link, at no time was Plaintiff made aware that his continued use of the Website would be subject to the TOS. To the contrary, Plaintiff had no knowledge that his use of the Website would be subject to an arbitration provision. Safer Decl. Ex. C (Pemberton Decl.) ¶¶ 2–3. Indeed, he was informed only that his continued use would be subject to his rejection of certain cookies.

*Nguyen* set forth a bright-line rule that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id*. at 1178–79 (emphasis added).

Defendants' Cookie Banner and Cookie Settings window do not incorporate or even mention the TOS. *See* CAC ¶¶ 34, 36 At best, RBI could argue that the TOS was hyperlinked by following the small "menu" link on the upper left of the home page and then clicking on another link through to its "Terms of Service." But neither the color, layout, font size, context, or Website flow establish that this inconspicuous link could satisfy the "inquiry notice" standard. *See Berman*, 30 F.4th at 856 ("[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would

have seen it."). Even if a Website user looked around and found the "menu" icon and clicked it, the "Terms of Service" link displayed on the next webpage is the same color, same font, and same font size as surrounding text, and appears below many other links and content. It is also not underlined, emboldened, or italicized. Safier Decl. Exs. D, E. Nor is there any textual notice on the "menu" page (or the home page) informing users that that continued use of the Website will constitute the user's agreement to be bound by the Website's TOS. This falls far short of what is required to put website visitors on inquiry notice. *Id*. at 856–57 (identifying the various ways in which "[t]he text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous"); *Nguyen*, 763 F.3d at 1179 (explaining "consumers cannot be expected to ferret out hyperlinks to terms and conditions"). Really, this is not even browsewrap. It is worse, and plainly unenforceable.

Second, even if the TOS link had been more conspicuous, Claimant never took any action to manifest his assent to the terms. As explained above, simply clicking a button is legally irrelevant unless something "explicitly notif[ies] a user of the legal significance of the action," i.e., that the click "would constitute assent to those terms and conditions." *Berman*, 30 F.4th at 858. Here, nothing anywhere says that clicking any of the buttons on the Cookie Banner or Cookie Settings window constitutes assent or agreement in any form to RBI's TOS.

In sum, no agreement to arbitrate was ever formed between the parties.

**B. Defendants' Waiver and Estoppel Arguments Are Without Merit.**

As RBI acknowledges, the Arbitrator already determined that Plaintiff did not waive his right to challenge whether his claims are subject to the TOS. Mot. at 9. Defendants have not moved to vacate that award (and there are very limited grounds to do so); instead, Defendants want to completely relitigate that decision and have this Court rule on the same issue. They are precluded from doing so under the doctrine of collateral estoppel because, as Defendants themselves concede: (1) the waiver issue is identical to the one decided in the arbitration; (2) they previously argued it in the arbitration; (3) it was decided against them in the prior proceeding; (4) the decision on the issue was final; and (5) the parties involved in the arbitration are the same

parties in this action. *See JPV I L.P. v. Koetting*, 304 Cal. Rptr. 3d 550, 566 (Cal. Ct. App. 2023) (identifying the five requirements for issue preclusion). Under California law, "[i]t is well settled that an arbitration award may provide the basis for issue preclusion." *Id.*

Defendants' only argument for disregarding the arbitral ruling is that the Arbitrator lacked the authority to make a decision as to whether Plaintiff waived his right to request a ruling on contract formation. But if Defendants truly (1) were unwilling to arbitrate the threshold issue of waiver and (2) believed only a court could decide that issue, then they would not have argued the issue to the Arbitrator in the hopes of obtaining a favorable ruling on that issue. Having voluntarily participated in briefing and arguments on the issue and then having lost on that issue, Defendants waived the right to argue the Arbitrator was without authority to decide the issue. *See Heavenseven GMBH v. Lovetuner, Inc.*, No. 2:22-cv-03464-MEMF(SKx), 2022 U.S. Dist. LEXIS 151555, at *13 (C.D. Cal. Aug. 17, 2022) (concluding that a party that had affirmatively urged the arbitrator to decide the question of arbitrability could not later argue the arbitrator lacked authority to rule on arbitrability).

Moreover, Defendants are wrong to suggest that an arbitrator can *never* determine whether an arbitration agreement exists in the first place. It is true that a standard form *pre*-dispute agreement cannot, by itself, require a consumer to arbitrate the question of whether he or she agreed to those terms in the first place. But parties can certainly choose to submit a dispute about contract formation to an arbitrator, if they mutually agree to do so after the dispute has arisen. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010) (explaining "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy"); *accord Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019). Moreover, the AAA Rules specifically authorize the parties to submit a dispute about the "existence" of an arbitration agreement to the arbitrator, and the arbitrator may rule on that question "as a preliminary matter." Safier Decl. Ex. F (AAA

Consumer Rule 7[1]). In this case, the Arbitrator declined to rule on the contract formation question because he found Defendants refused to consent to submit that threshold question to him for determination, and thus there was no mutual agreement to arbitrate the parties' contract formation dispute. *See* ECF No. 11-1 Ex. E. However, Plaintiff and Defendants did agree to submit the waiver issue to the Arbitrator for determination, and thus the Arbitrator's decision on such a threshold issue is as enforceable as any other. *Cf. Heavenseven GMBH v. Lovetuner*, Inc., No. 2:22-cv-03464-MEMF(SKx), 2022 U.S. Dist. LEXIS 151555, at *13 (where a party participated in the arbitration solely to contest the arbitral forum's jurisdiction over the underlying dispute and obtained a favorable ruling on that point).

To the extent the Court revisits the waiver issue, Plaintiff did not waive his right to challenge arbitrability, as the Arbitrator correctly found. Waiver occurs *only* upon an "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). Far from intentionally relinquishing his argument that he did not agree to the TOS, Plaintiff raised that argument from the very beginning. Even prior to initiating the arbitration, Plaintiff requested that RBI agree not to assert its arbitration agreement and/or allow a court to decide the arbitrability issue. Safier Decl. ¶ 2. It refused. *Id*. Plaintiff was then faced with filing suit or filing an arbitration demand to challenge jurisdiction/enforceability of the arbitration agreement in the TOS. He opted for the latter, as a matter of efficiency. In doing so, he did not waive his right to challenge jurisdiction/enforceability of the TOS. *See* ECF No. 11-1 Ex. C (Demand for Arbitration) § 2 ("claimant challenges the arbitrability of this dispute").

Because Plaintiff challenged the existence of the alleged arbitration agreement from the very outset, clearly communicated that position to both Defendants and the Arbitrator, and sought a threshold ruling on that issue, he did not waive his argument that he did not agree to the TOS. *See Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 788 (9th Cir. 2001) ("Textile only

---

[1] At the time of the arbitration, AAA Consumer Rule 7 appeared as Rule 14. The AAA has subsequently updated its rules, however, the substance of the Rule remains the same.

participated in the arbitration to contest the arbitration itself [and] [i]n so doing, Textile did not waive its objection to the arbitration."); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1278–80 (9th Cir. 2006) (en banc) ("[Claimant] never withdrew her original objections to the arbitration agreement," despite participating in the arbitration, so "[t]here is no evidence that [Claimant] intentionally relinquished or abandoned her right to object to arbitration."); *Pen. Plan for Pen. Tr. Fund for Op. Eng'rs v. Weldway Const., Inc.*, 920 F. Supp. 2d 1034, 1048 (N.D. Cal. 2013) (no waiver where plaintiffs objected to arbitrability at outset, and their "participation was limited to procedural issues and actions necessary to preserve their rights" rather than the merits); *Openshaw v. FedEx Ground Package Sys.*, 731 F. Supp. 2d 987, 999 (C.D. Cal. 2010) (rejecting argument that "since Mr. Openshaw initiated the arbitration, he waived his opportunity to object to it" and analogizing to *Nagrampa*, as the claimant had objected to arbitrability within two months after initiating the arbitration and had not proceeded to arbitrate the merits of his underlying claim).

None of the waiver cases cited by Defendants involved circumstances similar to those presented here; to the contrary, each involved situations where a litigant initiated and participated in arbitration *on the merits*. In one of the cases, a party raised an arbitrability challenge for the first time only after losing on the merits. *See Stewart v. Blue Cross/Blue Shield of NV*, 81 Fed. App'x. 904, 905 (9th Cir. 2003) (rejecting the appellant's argument that a statute invalidated the arbitration agreement where she raised that issue only "*after* participating fully in the arbitration and losing"). In *Nghiem v. NEC Elec.*, 25 F.3d 1437, 1440 (9th Cir. 1994), the claimant initiated the arbitration, presented evidence, and submitted a closing brief of fifty pages on the merits. In *Garcia v. Amazon*, No. 2:21-cv-00604-SBMRW, 2021 U.S. Dist. LEXIS 134403 (C.D. Cal. May 25, 2021), the claimant expressly and affirmatively sought to arbitrate the merits of his claims (requesting that his claims "be resolved by final and binding arbitration . . . pursuant to an Agreement signed in or around 2019") and then later, after a change in counsel, attempted to object to the arbitration and proceed in court instead. In *Roderick v. Mazzetti & Assocs., Inc.*, 2004 WL 2554453, at *2 (N.D. Cal. Nov. 9, 2004), the plaintiff originally sought to arbitrate the

*merits* of his claims, became involved in a dispute over which AAA rules should apply, and then attempted to proceed in federal court. Similarly, in *PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692, 698 (6th Cir. 2019), the plaintiff waited to challenge the arbitration provisions until after it had initiated the arbitration and begun litigating it on the merits. None of these cases involved a claimant who expressly and consistently challenged arbitrability at the outset and as the focus of the arbitration.

Defendants further argue that, under both the doctrines of waiver and estoppel, Plaintiff's submission of the TOS in conjunction with his arbitration demand precludes him from arguing that he did not agree to the TOS. But Plaintiff submitted the TOS to provide the terms that he was expressly challenging (as set forth in section 2 of his arbitration demand) and that were the subject of the parties' arbitrability dispute (as noted in the Arbitrator's ruling), and as required to initiate a AAA proceeding. He certainly did *not* submit them as a concession that he had agreed to arbitrate the merits of his privacy claims against Defendants or otherwise to "enforce" the TOS, as Defendants suggest. If Plaintiff had done that, the parties would have simply arbitrated Plaintiff's claims on the merits and the threshold dispute and ruling would never have occurred.

Finally, there is no prejudice to Defendants or other basis for estoppel here. *See Gorlach v. Sports Club Co.*, 209 Cal. App. 4th 1497, 1506 (2012) ("The sine qua non of estoppel is that the party claiming it *relied to its detriment* on the conduct of the party to be estopped.") (internal quotation marks omitted). Defendants have known Plaintiff's position on arbitrability from the very beginning and did not rely on Plaintiff's submission of the TOS as the basis for an agreement to arbitrate. Indeed, if anyone has switched positions with respect to arbitrability, it is Defendants. Prior to commencing the arbitration, Plaintiff offered to proceed in court, but Defendants rebuffed that offer; thereby, choosing the AAA as the form for the arbitrability dispute. Then, after the arbitration was filed, Defendants maintained that they did not agree to arbitrate the issue of contract formation, either in the TOS or subsequently, and that the threshold dispute should have been brought in court rather than arbitration. The Arbitrator *agreed* with Defendants on that point.

There is no basis for Defendants to now argue that they relied on the TOS in the preceding arbitration or that they adopted a position to their prejudice based on the TOS.

The Court should reject Defendants' waiver and estoppel arguments.

**C. RBI's Requested Discovery Is Overbroad and Unnecessary**

"The FAA provides for discovery and a full trial in connection with a motion to compel arbitration *only if* 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.'" *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) (quoting 9 U.S.C. § 4). The making of that agreement is only "in issue," however, where the "party seeking to invoke the FAA § 4 [makes] a prima facie showing that an agreement to arbitrate existed." *Blau v. AT & T Mobility*, 2012 U.S. Dist. LEXIS 217, at *9 (N.D. Cal. Jan. 3, 2012) (internal quotation marks and citations omitted). Only then does the burden shift to the party opposing arbitration to put the making of that agreement "in issue." *Id*. Indeed, where, as here, a defendant makes only vague references to the specific discovery necessary to decide a motion to compel arbitration, courts will decline to order discovery without first considering the arguments of the underlaying motion. *See Ramirez v. Trusper, Inc.*, No. 5:24-cv-02012-EJD, 2024 U.S. Dist. LEXIS 117910, at *5–6 (N.D. Cal. July 3, 2024) ("the Court cannot determine whether discovery is needed because the Court does not have the benefit of the Parties' briefing on the underlying motion to compel arbitration . . . . [A]s it stands, particularly considering the vagueness in Ramirez's present request for discovery, the Court does not have the complete picture of the factual disputes").

Here, curiously, Defendants have chosen not to advance any arguments that Plaintiff agreed to the TOS. Rather, Defendants contend that they need additional discovery to determine whether Plaintiff was on actual notice of the TOS. But Plaintiff has already submitted a signed declaration stating that he did not have actual notice. *See* Safier Decl. Ex. C. Under these circumstances, Defendants are simply hoping to conduct a fishing expedition. Indeed, in each of the cases cited by Defendants, material issues of fact existed as to which discovery was necessary. *See* Mot. at 14. Here, in contrast, Defendants do not contest the layout of the cookie banner and

webpage, or that the TOU did not appear in the banner. Defendants also acknowledge that Plaintiff has submitted a declaration stating that he did not have actual knowledge of the TOU when he used the Website. Mot. at 7.

Instead, Defendants support their request by attacking Plaintiff and his counsel and mischaracterizing normal events in a litigation—such as that a litigant may become aware of a defendant's hidden, unlawful conduct through communications with counsel, that counsel often represents more than one client, and that two plaintiffs in a putative class action can have virtually identical claims (particularly here, where the website and cookie violations were the same)—to try to make them appear "suspicious" and to baselessly (and improperly) speculate that Plaintiff is dishonest and engaged in litigation misconduct. The Court should reject such aspersions. It should also reject Defendants' improper references to a ruling in a different arbitration, involving different circumstances, and whose findings are vehemently disputed. That ruling has no bearing on whether the TOS is enforceable here. It is simple misdirection.

## IV. CONCLUSION

For the foregoing reasons, RBI's motion must be denied.

Dated: July 8, 2025

GUTRIDE SAFIER LLP

/s/Seth A. Safier
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*