UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL PEMBERTON, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RESTAURANT BRANDS INTERNATIONAL, INC. and RESTAURANT BRANDS INTERNATIONAL US SERVICES LLC,<br><br>Defendants. | Case No. 25-cv-03647-JSC<br><br>**ORDER RE: MOTION TO COMPEL ARBITRATION, AND IN THE ALTERNATIVE, FOR LIMITED DISCOVERY PRIOR TO RESOLVING THE MOTION TO COMPEL**<br><br>Re: Dkt. No. 11 |

Plaintiff seeks to represent a class of people who browsed the Burger King website while in California "after opting out of the sale/sharing of their personal information in the [website's] cookies consent preferences window." (Dkt. No. 1 ¶ 99.)[1] He alleges Defendants, who own and operate the Burger King website, deceive users because "when users moved the toggle to opt out of the sale/sharing of their personal information and opt out of all cookies, except those that were strictly necessary, including targeting cookies and performance cookies, Defendants nonetheless continued to cause [] Third Parties' cookies to be placed on users' devices and/or transmitted to [] Third Parties along with user data." (*Id.* ¶¶ 27, 40.)[2] Now pending before the Court is Defendants' motion to compel arbitration and, in the alternative, for limited discovery prior to resolving the motion to compel. (Dkt. No. 11.) Having carefully considered the parties' submissions, and with the benefit of oral argument on September 4, 2025, the Court DENIES

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] Plaintiff defines "Third Parties" as Google LLC (DoubleClick and Google Analytics), Meta Platforms, Inc. (Facebook), Microsoft Corporation (Microsoft Clarity), Snap Inc. (SnapChat), The Trade Desk, Inc., and AdTheorent, Inc. (Dkt. No. 1 ¶ 2.)

Defendants' motion to compel arbitration and for limited discovery. Defendants concede the record does not support a finding Plaintiff agreed to the website's Terms of Service, and they have not shown Plaintiff waived his right to challenge or estopped himself from challenging the existence of an arbitration agreement by asking an arbitrator to determine he never agreed to arbitrate disputes with Defendants. Defendants also have not identified any facts to warrant discovery on the existence of an arbitration agreement.

**BACKGROUND**

**I.    COMPLAINT ALLEGATIONS**

Plaintiff Daniel Pemberton is a California resident. (Dkt. No. 1 ¶ 6.) Around March 2023, Plaintiff visited the Burger King website. (*Id.* ¶ 84.) The website "immediately" presented a popup cookie consent banner ("Cookie Banner") offering Plaintiff the options "Accept Cookies" or "Cookie Settings." (*Id.* ¶ 85.) After Plaintiff clicked the "Cookie Settings" button, the website displayed a "cookie consent preferences window" ("Cookie Window"), which included a toggle switch and stated: "You may exercise your right to opt out of the sale of personal information by using this toggle switch. If you opt out we will not be able to offer you personalized ads and will not hand over your personal information to any third parties." (*Id.* ¶¶ 36, 86.) Plaintiff moved the toggle switch to opt out, and clicked a "Confirm my Choices" button. (*Id.* ¶ 86.) Believing the steps he had taken "would allow him to opt out of, decline, and/or reject all non-required cookies and other tracking technologies," Plaintiff continued to browse the website. (*Id.* ¶¶ 86, 89.) According to Plaintiff, "Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those that cause the disclosure of user data to the Third Parties on his device, . . . [which] permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website." (*Id.* ¶ 89.)

**II.    PROCEDURAL HISTORY**

Around October 20, 2023, Plaintiff learned about Defendants' alleged conduct from his counsel. (*Id.* ¶ 92.) A few weeks later, Plaintiff's counsel notified Defendants of Plaintiff's allegations and claims. (*Id.* ¶ 93.) Defendants then asserted Plaintiff's claims were subject to arbitration through the website's Terms of Service, and Plaintiff's counsel responded the Terms of

Service's arbitration provision was inapplicable to Plaintiff's claims because "Plaintiff did not take any action to manifest his assent" to the Terms of Service. (*Id.* ¶ 94.)

On November 13, 2023, Plaintiff filed a demand for arbitration with the American Arbitration Association. (Dkt. No. 11-1 at 19–20.) In the demand form, Plaintiff explained his dispute with Defendants as: "See attached arbitration demand; claimant challenges the arbitrability of this dispute on behalf of [him]self and others similarly situated." (*Id.*) Plaintiff alleges his arbitration demand provided Defendants notice of his claims, his refusal to assent to the Terms of Service, his belief the arbitration provision was unenforceable against him, and his intent to pursue a class action in court "should the arbitrator determine that his claims were not subject to arbitration." (Dkt. No. 1 ¶¶ 95–96.)[3] In addition, because the demand form asked filers to attach a "clear, legible copy of the contract containing the parties' agreement to arbitrate disputes," Plaintiff attached the website's Terms of Service. (Dkt. No. 11-1 at 20; Dkt. No. 11 at 12.) Plaintiff then filed a Motion re Non-Arbitrability, which argued the website's arbitration provision was unenforceable against him and he was entitled to pursue his claims in court. (Dkt. No. 1 ¶ 96.) Defendants opposed Plaintiff's motion and argued Plaintiff consented to arbitration by voluntarily initiating arbitration and, unless the arbitrator found Plaintiff waived his objections to arbitrability, the arbitrator lacked authority to determine whether an arbitration agreement existed. (Dkt. No. 11 at 13.)

On July 9, 2024, the arbitrator ruled a federal court needed to decide whether an arbitration agreement existed, but Plaintiff had not waived his right to challenge an arbitration agreement's existence by initiating arbitration. (Dkt. 11-1 at 44–45.) The arbitrator placed the arbitration on administrative hold pending a court's determination of whether an enforceable arbitration agreement existed. (*Id.*)

Nearly ten months later, Plaintiff filed a complaint on behalf of a California class including claims for (1) invasion of privacy, (2) intrusion upon seclusion, (3) wiretapping in violation of the

---

[3] While Defendants included the arbitration demand "form" with their motion to compel, they did not include the referenced "attached arbitration demand." (Dkt. No. 11-1.) So, nothing in the record contradicts Plaintiff's allegations as to what his arbitration demand stated.

1  California Invasion of Privacy Act (Cal. Penal Code § 631), (4) use of a pen register in violation
2  of the California Invasion of Privacy Act (Cal. Penal Code § 638.51), (5) common law fraud,
3  deceit, and/or misrepresentation, (6) unjust enrichment, and (7) trespass to chattels.  (Dkt. No. 1 ¶¶
4  107–86.)  Pending before the Court are Defendants' motion to compel arbitration and motion to
5  dismiss the complaint.  (Dkt. Nos. 11, 12.)

## III.     RELEVANT FACTS RE: TERMS OF SERVICE

The website's Terms of Service include an arbitration provision.  (Dkt. No. 11-1 at 28.)  Plaintiff attests when he visited the website in 2023, he "did not know that [his] continued use of the website was subject to arbitration with Burger King," he "did not see, or follow, a link on the Website to the Terms of Service," and he understood his only agreement with Burger King to be "that [his] continued use of the Website would not be tracked."  (Dkt. No. 27-4 ¶¶ 2–3.)  Plaintiff also testifies he has "never ordered online from Burger King," "downloaded a Burger King app," or "joined Burger King's rewards program."  (*Id.* ¶ 4.)  Plaintiff further alleges the website did not display the Terms of Service when he went through the cookie opt-out process, and the Cookie Banner and Cookie Settings windows do not include a click or check-box agreement to or mention of the Terms of Service.  (Dkt. No. 27 at 8.)  According to Plaintiff, the website also does not link to the Terms of Service on the home page or any other substantive webpages.  (*Id.*)  Instead, to access the Terms of Service, "a user must first click on the small 'menu' icon that is displayed as three parallel horizontal lines," and then the user "can choose the link to the Terms of Service, which appears among a list of many other hyperlinks."  (*Id.*)

## DISCUSSION

The Federal Arbitration Act ("FAA") governs arbitration agreements "evidencing a transaction involving commerce."  9 U.S.C. § 2.  Such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *Id.*  In resolving a motion to compel arbitration under the FAA, "a court's inquiry is limited to two gateway issues: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quotation marks and citation omitted).  "If both conditions are met, the

4

1  FAA requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*
2  (quotation marks and citation omitted).
3        The existence of an arbitration agreement is a question for the Court, not an arbitrator. *See*
4  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564–65 (9th Cir. 2014). As the parties seeking to
5  compel arbitration, Defendants "bear the burden of proving the existence of an agreement to
6  arbitrate by a preponderance of the evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th
7  Cir. 2023). When, as here, "the making of the arbitration agreement" is at issue, the summary
8  judgment standard applies. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021)
9  (quoting 9 U.S.C. § 4). To prevail under the summary judgment standard, Defendants must show
10 there is no genuine issue as to any material fact regarding formation of the arbitration contract.
11 *See id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Conversely, to deny the
12 motion to compel arbitration, rather than hold a trial on arbitration agreement formation, the Court
13 must find no reasonable trier of fact could find an agreement was made. *See Hansen*, 1 F.4th at
14 672 ("[O]nce a district court concludes that there are genuine disputes of material fact as to
15 whether the parties formed an arbitration agreement, the court must proceed without delay to a
16 trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues
17 have been resolved.").

18     **A.**    **The Parties Did Not Enter an Arbitration Agreement**

19       "In determining whether the parties have agreed to arbitrate a particular dispute, federal
20 courts apply state-law principles of contract formation." *Patrick v. Running Warehouse, LLC*, 93
21 F.4th 468, 476 (9th Cir. 2024) (quotation marks and citation omitted). Under California law, the
22 "vital elements of a cause of action based on contract are mutual assent (usually accomplished
23 through the medium of an offer and acceptance) and consideration." *Aton Ctr., Inc. v. United*
24 *Healthcare Ins. Co.*, 93 Cal. App. 5th 1214, 1231 (2023) (quotation marks and citation omitted).
25 To put it another way, "there must be actual or constructive notice" of the contract offer "and the
26 parties must manifest mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13
27 (9th Cir. 2023).
28       Plaintiff attests he did not know about the Terms of Service's arbitration terms when he

visited the website, and Defendants do not offer any evidence he did. (Dkt. No. 27-4 ¶ 3.) So, no reasonable trier of fact could find Plaintiff had actual knowledge of the Terms of Service and assented to Defendants' arbitration offer. As for constructive knowledge, Plaintiff contends—and Defendants do not contest—the Terms of Service constitutes a browsewrap agreement insufficient to charge him with constructive notice. (Dkt. No. 27 at 11.) In contrast to "clickwrap" agreements, in which a "website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed," "browsewrap" refers to a "website offer[ing] terms that are disclosed only through a hyperlink" in which "the user supposedly manifests assent to those terms simply by continuing to use the website." *Oberstein*, 60 F.4th at 513. A browsewrap agreement may be enforceable if "the website provide[d] reasonably conspicuous notice of the terms to which the consumer will be bound" through factors such as font size, font color, and the visibility of hyperlinks. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022). When a website is found to provide reasonably conspicuous notice of its browsewrap terms, the plaintiffs are charged with inquiry notice of those terms—regardless of whether the plaintiffs themselves saw them—because "the court can fairly assume that a reasonably prudent Internet user would have seen" them. *Id.*

The Terms of Service were not clickwrap because Plaintiff did not encounter a "text box or clickable button" referencing them, and they were not mentioned or incorporated by reference in the agreements Plaintiff did encounter. (Dkt. No. 27 at 12.) As to whether the Terms of Service constituted enforceable browsewrap, Plaintiff explains the Terms of Service are accessed by "following the small 'menu' link on the upper left of the home page and then clicking on another link through to its 'Terms of Service.'" (*Id.*; Dkt. No. 27-5.) Within the menu link, the Terms of Service link is the "same color, same font, and same font size as surrounding text, [] appears below many other links and content, . . . [and] is also not underlined, emboldened, or italicized." (Dkt. No. 27 at 13; Dkt. No. 27-6.) So, the website did not provide reasonably conspicuous notice of the Terms of Service; indeed, Defendants do not contend it did. *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014) (holding terms hyperlinked at bottom of every webpage and "underlined" in "color-contrasting text" not reasonably conspicuous); *see also*

6

*Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 766 (N.D. Cal. 2025) (finding terms hyperlinked at bottom of webpage in gray font matching other webpage elements not reasonably conspicuous).  Plaintiff therefore lacked constructive notice of the arbitration offer as a matter of law.

### B. Waiver and Estoppel

While Defendants do not dispute the record does not support a finding Plaintiff had actual or constructive knowledge of the Terms of Service, they nevertheless argue Plaintiff either waived his ability to challenge the existence of an arbitration agreement or should be equitably estopped from doing so.

#### 1. Waiver

"[V]oluntary initiation of arbitration can be interpreted as waiver of any objection [the plaintiff] may have had over the authority of the arbitrator." *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1440 (9th Cir. 1994).  But "not all participation in arbitration waives a party's objection to arbitration." *Plan for Pension Trust Fund for Operating Eng'rs v. Weldway Constr. Inc.*, 920 F. Supp. 2d 1034, 1047 (N.D. Cal. 2013); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946 (1995) (holding plaintiffs did not waive challenge to arbitrability because arguing non-arbitrability before arbitrator did not "indicate a clear willingness to arbitrate that issue"). "[C]ontractual waiver generally requires an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished, with no required showing of prejudice." *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1014 (9th Cir. 2023) (quotation marks and citation omitted).  "The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 851 F.3d 976, 984 (9th Cir. 2017) (cleaned up) (quoting *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 31 (1995)).

In *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) (en banc), the Ninth Circuit explained the key inquiry to determine waiver of a challenge to arbitrability is whether the party objecting to arbitration "intentionally relinquished or abandoned [its] right to object to

7

arbitration." *See id.* at 1278–79 (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)). Referencing prior cases, the Ninth Circuit explained how parties might relinquish or abandon their right to object. For example, waiver occurred when a party "'initiated the arbitration, attended the hearings with representation, presented evidence, and submitted a closing brief of fifty pages,'" *id.* at 1279 (quoting *Nghiem*, 25 F.3d at 1440); participated in arbitration hearings on the merits and waited for the other party to present all its evidence, *id.* (citing *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1356–57 (9th Cir. 1983) (per curiam)); or waited to receive an unfavorable decision, *id.* (citing *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 656–57 (9th Cir. 1964)). The objecting party in *Nagrampa*, however, had not waived her right to object to arbitration because she "forcefully objected to arbitrability at the outset of the dispute, never withdrew that objection, and did not proceed to arbitration on the merits of the [] claim." *Id.* at 1280; *see also Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 788 (9th Cir. 2001) (finding no waiver when party "only participated in the arbitration to contest the arbitration itself").

Like in *Nagrampa*, Plaintiff "challenged the existence of the alleged arbitration agreement from the very outset" and "maintained no [arbitration] agreement was formed" throughout communications with Defendants, the demand for arbitration, and the arbitrator's proceeding. (Dkt. No. 11-1 at 19, 44; Dkt. No. 27 at 15.) Furthermore, the arbitration proceedings never considered or ruled on the merits of Plaintiff's claims because the arbitrator declined to decide the threshold question of whether an arbitration agreement existed. (Dkt. No. 11-1 at 44–45.) Defendants' argument Plaintiff waived his right to object to arbitration by asking an arbitrator to confirm no arbitration agreement existed therefore conflicts with *Nagrampa*, and Plaintiff did not waive his right to object to the existence of an arbitration agreement.[4]

Defendants' insistence Plaintiff waived the right to challenge his assent to the Terms of Service by attaching them to the form he filed initiating arbitration is specious. Defendants do not

---

[4] Plaintiff contends collateral estoppel prevents Defendants from arguing Plaintiff has waived his right to challenge arbitrability because the arbitrator rejected the argument. (Dkt. No. 27 at 13–14.) Because the Court concludes Plaintiff has not waived his ability to challenge arbitrability, it need not decide whether collateral estoppel applies.

dispute Plaintiff's assertion he never "intentionally relinquish[ed]" his right to challenge the existence of an arbitration agreement. (Dkt. No. 27 at 15.) Instead, Plaintiff's arbitration demand form noted he "challenge[d] the arbitrability of this dispute." (Dkt. 11-1 at 19.) And, according to the complaint, the demand itself, attached to the form, asserted Plaintiff had not assented to the Terms of Service, believed the arbitration provision was unenforceable, and intended to pursue his claims in court depending on the arbitrator's arbitrability determination. (*Id.*; Dkt. No. 1 ¶¶ 95–96.) Given Plaintiff's continuous statements challenging arbitrability, Plaintiff's attachment of the Terms of Service cannot be considered "conduct so inconsistent with the intent to" challenge arbitrability "as to induce a reasonable belief" Plaintiff relinquished the right to raise such a challenge. *Armstrong*, 59 F.4th at 1014 (quotation marks and citation omitted).

Defendants' reliance on the Terms of Service's language providing the question of "whether or not the agreement to arbitrate was validly formed[]" is for a court (Dkt. No. 11-1 at 28) is unavailing. No law prohibits parties from separately agreeing to submit a dispute about the formation of an arbitration agreement to an arbitrator. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) ("[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate.") Although Defendants did not agree to arbitrate whether an arbitration agreement existed (but did agree to arbitrate whether Plaintiff waived his challenge to formation) (Dkt. No. 11-1 at 45), Plaintiff's offer to arbitrate that gateway question does not support a finding Plaintiff waived his challenge to the existence of an arbitration agreement.

So, Defendants do not meet their burden of proving by clear and convincing evidence Plaintiff waived his right to challenge the existence of an arbitration agreement.

### 2. Estoppel

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (quotation marks and citation omitted). In the arbitration context, "a nonsignatory may be held to an arbitration clause where the nonsignatory knowingly exploits the agreement containing the arbitration clause despite having never signed the

9

agreement." *Id.* at 1046 (quotation marks and citation omitted). However, "[b]ecause generally only signatories to an arbitration agreement are obligated to submit to binding arbitration," equitable estoppel of a nonsignatory is "narrowly confined." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) (citation omitted). Defendants argue Plaintiff "exploited the Agreement by seeking 'to enforce the terms of the agreement' when he chose to initiate arbitration." (Dkt. No. 11 at 21 (quoting *Eclipse Consulting, Inc. v. BDO USA, LLP*, No. 3:17-cv-826-AC, 2018 WL 6735085, at *3 (D. Or. Nov. 13, 2018)).) But Plaintiff did not file an arbitration demand to enforce the Terms of Service's arbitration provision and exploit an arbitration agreement with Defendants. Instead, Plaintiff filed the arbitration demand to preclude enforcement of the Terms of Service's arbitration provision and consistently denied an arbitration agreement with Defendants existed. Defendants therefore cannot leverage equitable estoppel to force Plaintiff to arbitrate.

Because Defendants have not met their burden of proving an arbitration agreement existed, and Plaintiff did not waive or estop himself from challenging the existence of an agreement, the Court denies Defendants' motion to compel arbitration.

## IV. MOTION FOR LIMITED DISCOVERY

Discovery may be appropriate on a motion to compel arbitration when the formation of a contract to arbitrate is at issue. *See* 9 U.S.C. § 4; *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999). A party "can support his request for discovery by suggesting what evidence he expects to derive from discovery and by suggesting circumstances that may raise doubt as to the formation of the agreement." *Hibler v. BCI Coca-Cola Bottling Co. of Los Angeles*, No. 11-cv-298-JLS (NLS), 2011 WL 4102224, at *1 (S.D. Cal. Sept. 14, 2021).

Defendants move for limited discovery into Plaintiff's actual knowledge of the Terms of Service preceding his website visit because "the arbitration agreement is still enforceable if Plaintiff had actual knowledge of the terms when he visited the Website." (Dkt. No. 11 at 10.) Defendants argue Plaintiff's declaration is "wordsmithed" to "carefully avoid[] the relevant question" of whether Plaintiff had "knowledge of the TOS or arbitration agreement." (Dkt. No. 28 at 7.) The Court disagrees. Plaintiff's attestation he did not know his "continued use of the

1   Website was subject to arbitration" is sufficient to establish Plaintiff had not manifested mutual

2   assent to Defendants' arbitration offer when visiting the website.  (Dkt. No. 27-4 ¶ 3.)

3         In seeking discovery, Defendants emphasize they "fully believe[] that Plaintiff—if he went

4   to the website at all—did so with full knowledge of the Agreement and as part of a scheme to

5   manufacture litigation in conjunction with Plaintiff's Counsel."  (Dkt. No. 11 at 23.)  But

6   Defendants base their suspicions on Plaintiff counsel's conduct in representing other clients,

7   including prior negotiations with Defendants and arbitration proceedings involving other

8   defendants, and do not explain why this Plaintiff would know about Defendants' arbitration

9   provision.  (*Id.* at 24.)  Ultimately, discovery to support a motion to compel arbitration is "strictly

10  limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the

11  claim and any defenses to the arbitrator."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d

12  1126, 1131 (9th Cir. 2000) (quotation marks and citation omitted).  Because Defendants' doubts

13  about the truthfulness of the allegations in Plaintiff's complaint go to the merits of Plaintiff's

14  claim, rather than the existence of an agreement to arbitrate those claims, those doubts do not

15  warrant discovery prior to a ruling on the motion to compel.

## CONCLUSION

17        Because on the record before the Court no reasonable trier of fact could find Plaintiff either

18  formed an arbitration agreement with Defendants or waived or estopped himself from challenging

19  the arbitration agreement's formation, the Court DENIES Defendants' motion to compel

20  arbitration and Defendants' motion for limited discovery prior to resolving the motion to compel.

21  The Court postpones ruling on Defendants' motion to dismiss until after Defendants determine

22  whether they will appeal this order denying the motion to compel arbitration.  The parties shall

23  jointly provide the Court with a status update by October 30, 2025.

24  //
25  //
26  //
27  //
28

This order disposes of Docket No. 11.

**IT IS SO ORDERED.**

Dated: September 5, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge